**MINNEAPOLIS, N. & S. RY.**
**v.**
**KELM, Collector of Internal Revenue.**

**MINNEAPOLIS, N. & S. RY.**
**v.**
**UNITED STATES.**
**Civ. Nos. 3966, 3967.**

United States District Court,
D. Minnesota, Fourth Division.
Nov. 12, 1953.

Hayner N. Larson and Loring M. Staples, Minneapolis, Minn. (Faegre &

Benson, Minneapolis, Minn., of counsel), for plaintiff.

H. Brian Holland, Asst. Atty. Gen., and Andrew D. Sharpe, Paul S. McMahon, Allen A. Bowden, Special Assts. to the Atty. Gen., and George E. MacKinnon, U. S. Atty., St. Paul, Minn., for defendants.

NORDBYE, Chief Judge.

These actions were brought to recover alleged overpayment of income and excess profits taxes for the years 1942 through 1945. The basis of the recovery is that the Collector, in computing depreciation for income tax purposes and certain tax credits for excess profits tax purposes, assigned the wrong basis to the taxpayer's property. It is the taxpayer's position that it is entitled to substitute for tax purposes the basis used by its predecessor, while the Government maintains that the basis of the property is its cost to the taxpayer. Essentially, the issue is whether the taxpayer corporation succeeded its predecessor corporation as a result of a sale or as a result of a reorganization within the meaning of Section 113(a) (7) or (20) of the Internal Revenue Code, 26 U.S.C.A. § 113(a) (7, 20).

The taxpayer's predecessor, Minneapolis, St. Paul, Rochester and Dubuque Electric Traction Company (hereinafter referred to as Dubuque), had operated a railroad in southern Minnesota for about eleven years prior to the taxpayer's acquisition of its properties. Dubuque, under a collateral trust agreement dated January 1, 1915, issued $750,000 in three-year 6 per cent collateral trust notes secured by a $1,000,000 Thirty-Year Gold Bond, which in turn was secured by a deed of trust given by Dubuque on all of its existing and after-acquired property. Upon default in the payment of interest, Dubuque petitioned this Court for the appointment of a receiver and such appointment was made on July 20, 1916. Thereupon, the trustees under the deed of trust and the trustee under the collateral trust agreement instituted separate proceedings for decrees of foreclosure   The court consolidated all the proceedings, and on December 22, 1916, found that $803,960.56 was then due and owing on the notes and the bond. On that date, a decree of foreclosure and sale was entered. When Dubuque did not discharge its indebtedness within the time allowed in the decree, its properties were offered for sale by the Master in Chancery in June, 1917. No sale was made because no bids were received. Thereafter, the creditors petitioned to abandon and dismantle the properties. Pursuant to this petition, the court ordered that the Master again offer the properties for sale. At the Master's sale in December, 1917, a committee representing the collateral trust noteholders (hereinafter referred to as the Noteholders' Committee) bid in the Dubuque spur line known as the Auto Club Cut-Off, and coupled their bid with the right or privilege of dismantling this portion of the road. No action was taken by the court on this bid at this time. No bids were received on the balance of the property.

Certain patrons of Dubuque and civic-minded residents of Minneapolis opposed the Noteholders' Committee's plan to dismantle the road. They organized a Contributors' Committee which filed with the court objections to the course advanced by the Noteholders' Committee. Apparently this led to negotiations between the Noteholders' Committee and the Contributors' Committee in that on May 6, 1918, the Contributors' Committee made an offer to the Noteholders' Committee to purchase for $225,000 all the collateral trust notes held by this Committee and their rights as purchasers of the Auto Club Cut-Off. This offer was accepted by the Noteholders' Committee. The agreement provided that the Contributors' Committee should succeed to the rights of the noteholders as purchasers of the Auto Club Cut-Off and should also have the right to assign all their rights in the agreement to any other person or concerns.

After the Contributors' Committee had made a down payment of $50,000

to the Noteholders' Committee, the former caused the taxpayer corporation to be organized on June 21, 1918. Thereupon, the Contributors' Committee assigned all of its rights under the option with the Noteholders' Committee to the taxpayer corporation in exchange for which the taxpayer corporation issued $50,000 par value stock pro rata among the members of the Contributors' Committee who had furnished the $50,000. Plaintiff assumed and agreed to pay the balance of $175,000 which it did on July 11, 1918, with money borrowed for that purpose. Thereupon, the Noteholders' Committee made an assignment of all the collateral trust notes and all its rights as purchasers of the Auto Club Cut-Off to the plaintiff. In a petition filed July 18, 1918, and jointly made by the plaintiff, the complainants in the foreclosure proceeding, and the Noteholders' Committee, the court was advised of plaintiff's organization, the acceptance of the noteholders' offer to the Contributors' Committee, and the assignment by the Noteholders' Committee to the plaintiff of its rights under the bid for the Auto Club Cut-Off. The court also was advised that if the lines other than the cut-off were offered for sale, plaintiff would bid for the same and assume the operation of the railroad if it became the successful bidder. The petition requested the court to enter a supplemental decree directing the sale of the property, with the exception of the Auto Club Cut-Off and certain moneys and bills receivable which had accrued during the receivership and to which the noteholders were entitled. The court on this petition and under its orders of July 19, 1918, made the plaintiff herein a defendant in the proceedings and confirmed the sale of the Auto Club Cut-Off which had been made as of December 18, 1917. The court also entered an order finding that the Noteholders' Committee had assigned and transferred to plaintiff all their rights in the bids made by it for the Auto Club Cut-Off and in the collateral notes described in the bill of equity and in the decree, and further found that the plaintiff desired that the amount of the bid for the Auto Club Cut-Off be endorsed upon the bond securing the collateral notes. The order also provided that the remaining part of the properties again be offered for sale, and that if it should be purchased by a holder of the bond, the bond might be applied in making the payment. On July 29, 1918, in pursuance of the court's order, the Dubuque properties, except the Auto Club Cut-Off and certain other personal property, were offered for sale. Plaintiff bid the upset price of $350,000, and this bid price was confirmed by the court by striking off that amount from the bond securing the collateral trust notes. On August 6, 1918, deeds to all the properties, including the Auto Club Cut-Off, were delivered to the plaintiff. It appears that the railroad properties were in continuous operation during the receivership, and after plaintiff became the owner, it continued the operation and has operated the railroad during all the time material herein. The amount of cash paid for the collateral trust notes by plaintiff was $225,000. The Contributors' Committee which had arranged for the purchase of the collateral notes and the Auto Club Cut-Off became the stockholders of the plaintiff.

Plaintiff's income and excess profits taxes for the years in question were computed and paid by the plaintiff upon the assumption that the properties under Section 113 of the Internal Revenue Code had, at the time of their acquisition, an aggregate cost of $225,000. A claim for refund for each of the years has been filed on the ground that the basis, instead of $225,000, should have been $2,354,008.98, which was the adjusted basis of the properties to the Dubuque immediately prior to their acquisition by plaintiff. Plaintiff's position is that it is entitled to have its depreciation deducted and computed on the $2,354,008.98 figure and to have that amount used in computing its invested capital for the purpose of computing its excess profits tax. So far as

here pertinent, Section 113(a) (7) provides that if a corporation during 1918 acquired property of another corporation in connection with the reorganization, and if immediately after such acquisition control of the property to the extent of fifty per cent or more remained in the same persons, then the property should thereafter have the same basis in the hands of the transferee corporation as it had in the hands of the transferor corporation. Section 113(a) (7) does not define a reorganization, but refers to the law applicable to the year in which the transfer was made to determine whether there was a reorganization. The Revenue Act of 1918, 40 Stat. 1057, was applicable to the transfer, but that Act does not define reorganization. But the decisions recognize that under that Act a reorganization of a defaulting corporation in connection with a foreclosure is a common form of reorganization. De Blois v. Commissioner, 1 Cir., 36 F.2d 11, 12. In that case, the court quoted with approval the definition of reorganization as found in 2 Bouv.Law Dict., Rawle's Third Revision, p. 2883 as follows:

"Reorganization. A term in common use to denote the carrying out, by proper agreements and legal proceedings, of a business plan for winding up the affairs of, or foreclosing a mortgage or mortgages upon the property of, insolvent corporations, more frequently railroad companies. It is usually by the judicial sale of the corporate property and franchises, and the formation, by the purchasers of a new corporation, in which the property and franchises are thereupon vested, and the stock and bonds of which are divided among such of the parties interested in the old company as are parties to the reorganization plan."

But to have a reorganization entitling the new corporation to the old corporation's adjusted basis, it also is essential that a substantial ownership interest in the reorganization enterprise be held by those in whom such interests resided

prior to the reorganization. Helvering v. Minnesota Tea Co., 1935, 296 U.S. 378, 385, 56 S.Ct. 269, 80 L.Ed. 284. Here, plaintiff contends it literally complies with the specific provisions of the 1918 Act in this regard in that all the owners of the proprietary interest in Dubuque prior to reorganization became the stockholders of the taxpayer. In Seiberling Rubber Co. v. Commissioner of Internal Revenue, 6 Cir., 1948, 169 F.2d 595, 597, the court emphasizes the necessity of perpetuating in the new company the proprietary interest of the owners in the old by a "reorganization of the same interests in a different form." In the case at bar, the proprietary interest in Dubuque was transferred to the Contributors' Committee before the foreclosure sale, but the Government contends that to be a tax-free transfer, the test is whether in an insolvency reorganization the persons by whom the insolvent's obligations were owned at the time the foreclosure sale was instituted are the same persons to whom the interests or shares in the successor corporation are issued. In that the assignment of the notes herein was made after the commencement of the foreclosure proceedings, instead of before, the Government's position is that in effect the taxpayer corporation acquired Dubuque through sale rather than through reorganization.

At the outset, however, both parties are apparently in accord that under Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, and Palm Springs Corporation v. Commissioner, 1942, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785, where the creditors of a corporation which is insolvent to the extent that its assets are insufficient to pay the stockholders anything and the creditors invoke the processes of the law to enforce their rights, they have stepped into the shoes of the old stockholders, and under such circumstances where such creditors take over the assets of the old corporation, and transfer them to the new corporation, the continuity of interests has not

been broken. That is, under such circumstances, there is a carrying over of the claims of these creditors. In effect, the creditors have taken command of the property of the old corporation and transferred it to the new corporation and thus the continuity of interests is satisfied. The Government recognizes that the facts in Helvering v. Alabama Asphaltic Limestone Co., supra, "are essentially the same as presented in the instant case with but one exception, to wit, the Noteholders' Committee at the time the reorganization proceedings were instituted was not substantially the same persons that formed the new corporation." This distinction, according to the Government, causes the break in the continuity of interests which the law requires.

It seems reasonably clear that, under the doctrine approved·in Helvering v. Alabama Asphaltic Limestone Co., supra, if the Noteholders' Committee herein held their notes and proceeded to reorganize this railroad by bidding in the properties at the foreclosure sale by a committee formed for that purpose, and then transferred the property to a new corporation composed of the stockholders, the continuity of interests test would be satisfied. But is the continuity of interests broken merely because after the foreclosure proceedings had been commenced there was a change in the ownership of the proprietary interests in the company? It is common knowledge that stockholders frequently dispose of their holdings during a receivership or during the reorganization of a railroad and before the transfer of the properties in reorganization. Such a sale of stock by the stockholders may result in a taxable loss to the sellers, but such transfers do not destroy the continuity of interests if the new stockholders ultimately become the bona fide stockholders in the successor corporation in the reorganization proceedings. Here, the transfer of the proprietary interests of the noteholders to the·Contributors' Committee was independent of the reorganization transfer. No one knew at the time of the transfer of the notes who ultimately would become the owners of the property. Whether or not the Contributors' Committee as the new noteholders would be able to purchase the property at the foreclosure sale was undetermined. True, the Contributors' Committee protested the dismantling of the properties and evidenced a community interest in keeping the road intact as an operating concern, and no doubt contemplated a plan to reorganize the road when the notes were purchased if that could be accomplished. However, whether they purchased the notes prior to the institution of the foreclosure proceedings or after the institution of such proceedings but before any sale, they became the owners of the proprietary interests in the old corporation before and independent of any reorganization transfer. In fact, the entire reorganization proceedings as such were subsequent to the acquiring of the notes by the Contributors' Committee. The former noteholders had determined to apply for the dismantling of the road due to the abortive attempt to find a purchaser at the foreclosure sale. The institution of the foreclosure proceeding by the noteholders and bondholders, while it ultimately became the vehicle for the reorganization of the road, such proceedings were not instituted for that purpose. To hold that merely because the Contributors' Committee purchased the notes during the foreclosure proceedings, the continuity of interests is broken because the persons who held the proprietary interest at the institution of the proceedings were not the same persons as those who became owners after the institution of the proceedings, is to fail to recognize the realities of the situation. Here, we have a bona fide and successful attempt to reorganize a road during the receivership proceedings after the original owners of the proprietary interests of the properties had failed to accomplish anything except to request the court to permit the salvage of the road. The determinative fact herein is that the Contributors' Com-

mittee became vested with the proprietary interest in the road prior to any reorganization transfer and that as assignees they were clothed with the same creditors' rights and powers as had inured to the former noteholders. Here, there was no requirement that they purchase the properties or reorganize the same as a condition of the transfer of the notes. The pending foreclosure proceedings did not in any manner condition the transfer of the notes or impose any obligation on the new noteholders to purchase or to reorganize the properties. Assume that the Contributors' Committee after obtaining the notes had dismissed the foreclosure proceedings and had pursued another method to reorganize the road. If the present reorganization result ensued from such other proceedings, no one could question the soundness of plaintiff's position herein. The mere adoption of the pending foreclosure proceedings to accomplish that which might have been attained by other methods of reorganization should not permit one to ignore the substance of that which was done in perpetuating in a new company the proprietary interests of the security holders in the old company. The new noteholders of Dubuque were not divested of their right to reorganize the company merely because they became owners during the pendency of the foreclosure proceedings. Their right as creditors in view of the circumstances and under Helvering v. Alabama Asphaltic Limestone Co., supra, was to stand in the shoes of the stockholders and as assignees of the notes to stand in the shoes of the assignors. Their equity ownership was as complete as that held by the old stockholders. They could liquidate the company if they desired. They could devise some plan of reorganization entirely disassociated with the pending foreclosure proceedings, or they could, if possible, obtain new capital and continue the operation of the road without reorganization. Under such circumstances, the acquiring of the proprietary interests unconditioned and unrestricted and entirely sep-

arate from the ultimate reorganization transfer of the properties does not conflict with the continuity of interests doctrine.

The plaintiff is entitled to a refund of taxes as prayed for in its complaints. The amount thereof is to be computed by the parties in harmony herewith.

In view of the conclusion indicated, it is not necessary to discuss the alleged applicability of Section 113(a) (20) of the Internal Revenue Code on which the taxpayer also relies for relief herein.

Findings of fact and conclusions of law consistent with the views expressed in this memorandum decision may be presented by the plaintiff upon ten days' notice.

An exception is reserved.