**Elmer F. KELM, Collector of Internal Revenue, Appellant,**

v.

**MINNEAPOLIS, NORTHFIELD & SOUTHERN RAILWAY, a Corporation, Appellee.**

**The UNITED STATES of America, Appellant,**

v.

**MINNEAPOLIS, NORTHFIELD & SOUTHERN RAILWAY, a Corporation, Appellee.**

**Nos. 15072, 15073.**

United States Court of Appeals Eighth Circuit.

Sept. 1, 1955.

Rehearing Denied Oct. 13, 1955.

Melva M. Graney, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., George E. MacKinnon, U. S. Atty., Alex Dim, Asst. U. S. Atty., St. Paul, Minn., with her on the brief), for appellants.

Loring M. Staples and Hayner N. Larson, Minneapolis, Minn. (Faegre & Benson, Minneapolis, Minn., with them on the brief), for appellee.

Before SANBORN, JOHNSEN, and VOGEL, Circuit Judges.

JOHNSEN, Circuit Judge.

These are suits by the Minneapolis, Northfield & Southern Railway for refunds of income and excess profits taxes paid by it for the years 1942 to 1945 inclusive. Two cases are involved, one against the incumbent Collector for taxes paid to him, and one against the United States for taxes paid to the previous Collector. The District Court, 117 F.Supp. 325, granted recovery of the refunds sought, and the Government has appealed.

Reversal or affirmance turns primarily upon whether the privilege accorded the taxpayer by § 113(a) (7) of the Internal Revenue Code of 1939, 26 U.S.C.A., of using the basis which its property had in the hands of its predecessor, the Minneapolis, St. Paul, Rochester and Dubuque Electric Traction Company, "if the property was acquired * * * in connection with a reorganization",[1] was intended by Congress to be controlled by the definition of "reorganization" contained in § 112(g) (1), applicable to reorganizations occurring under the Code, or was intended to allow such status of "reorganization" to be continued to be recognized, as existed in the taxpayer's favor under the Revenue Act of 1918, 40 Stat. 1057, when the property was acquired.

We think that the District Court properly took the view that Congress, in making continuance, in § 113(a) (7) of the Code, of the privilege of a corporation to use the basis of its predecessor as to property acquired in a reorganization—which privilege has in general been accorded legislative existence under all Revenue Acts subsequent to and inclusive of that of 1918—intended, in the application of the privilege to reorganizations which had occurred before the enactment of the Code, to give recognition to the definition or meaning of the term "reorganization", and the status given establishment thereby, under the Revenue Act in force at the time the transfer of property took place.

The Government contends that this view is erroneous, because § 113(a) (7) does not contain any express indication of such an intended recognition of the reorganization concepts existing under previous Revenue Acts, and that the reference therein to property acquired by a corporation in connection with a reorganization ought therefore to be taken to mean property acquired in a "reorganization", as that term is defined in the Code, and not as it may have been used in such Revenue Act as was in force at

I. Section 113(a) (7) of the Code, in its here-material portion, provides:
"(a) The basis of property [for computation of net income shall be the cost of such property; except that—* * * (7) If the property was acquired—(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them * * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *"

the time the property-transfer occurred. It argues that support for this position exists from the inclusion of paragraphs (12) and (16) in § 113(a), in that, unless the construction of paragraph (7) for which it contends is adopted, then paragraphs (12) and (16) would be duplicitous as to part of the application being made of paragraph (7)—or, in other words, as we understand the argument, there could not then be said to be any reason for paragraphs (12) and (16), or at least a portion thereof, to have been enacted in the section.

Paragraph (12) provides that, "If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1934, and the basis thereof, for the purposes of the Revenue Act of 1932, 47 Stat. 199, was prescribed by section 113(a) (6), (7), or (9) of such Act, then for the purposes of this chapter the basis shall be the same as the basis therein prescribed in the Revenue Act of 1932." Similarly, paragraph (16) provides that, "If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1936, and the basis thereof, for the purposes of the Revenue Act of 1934 was prescribed by section 113(a) (6), (7), or (8) of such Act, then for the purposes of this chapter the basis shall be the same as the basis therein prescribed in the Revenue Act of 1934."

The effect of the argument made is that, by thus expressly according recognition to such property bases as had been acquired under the provisions of the Revenue Acts of 1932 and 1934, Congress should be held to have impliedly intended to deny recognition to the property bases acquired by means of reorganization under other Revenue Acts, except as those previous reorganizations would be capable of qualifying under the standards prescribed by the Code for such reorganizations as should occur during its operation.

We are not, however, persuaded by the Government's argument that the conclusion for which it contends is a necessary or even a reasonable one.

First of all, we think it should be emphasized that Congress has—presumably as an aid in keeping business enterprises from passing off the economic scene— seen fit, by every Revenue Act which it has enacted since 1918, as has been mentioned, to allow a reorganization basis to be established for corporate property. Obviously, the according of this tax privilege could hardly be much of an incentive for inducing enterprises to be reorganized and continued, if the property basis, purporting to be accorded establishment, were one which Congress meant and was holding out at the time to be utterly without any likelihood of more than a momentary status. The advantage capable of being derived from the status is, of course, not ordinarily one that is of immediate economic or tax benefit to a reorganized corporation, at least in many cases. It is not usually until the reorganized corporation has had time enough to get somewhat onto its feet, in operations and earnings, that its tax basis for depreciation and excess profits becomes a matter of pecuniary effect and reach. And, as the reported decisions show, it generally is then, like in the present case apparently, that the question of whether a reorganization has occurred first becomes an issue with the Treasury Department.

These considerations and realities, it seems to us reasonable to assume, have naturally been within the cognizance and contemplation of Congress, as it has, continuously since 1918, allowed a reorganization basis to exist for corporate property—a practice so long adhered to as to seem almost an established tax-law policy. And we think it further naturally is entitled to be inferred that Congress must have intended that its initiation and continuance of the privilege should constitute, not meaningless gestures, but useful actions, which would enable each of such Revenue Acts to serve in encouraging reorganizations, as against liquidations, in the field of corporate enterprise.

But if the according of this property-basis privilege should, in its long contin-

uation, be regarded as having been wholly a whimsical one for each Revenue Act, such as the Government in effect here contends—in that the matter of whether or not a reorganization ever has been effected is to be treated as a seasonal question, required to be tested from year to year, not on the basis of the Revenue Act in force at the time the things involved were done, but by the ability of that which has been done vicariously to meet such standards as Congress might see fit to impose in subsequent Revenue Acts for the according of recognition to reorganizations occurring under those Acts—then the privilege is not, in its uncertainties of actual benefits, a very meaningful one, as an intended incentive for corporate reorganization and enterprise preservation.

On all of this, we believe it more reasonable to infer, on the question of legislative intent, that, if Congress had intended the definition of "reorganization" adopted in any subsequent Revenue Act to have application other than as a standard for reorganizations occurring under that particular Act, it would have so stated, or in some other manner have given compelling indication of such an intent, than to infer that, because Congress did not expressly declare that the definition of "reorganization" adopted by it in a subsequent Act, in relation to reorganizations occurring under that Act, should not have application to reorganization statuses acquired under prior Acts, it must have intended the definition of the subsequent Act to be affective of any reorganization statuses which had been created by prior Acts.

And we do not feel that the Government's argument as to the implicational significance of the inclusion of paragraphs (12) and (16) in § 113(a), referred to above, is demonstrative of any compelling indication of an intent on the part of Congress contrary to that just inferred. In the first place, the construction which we have made of paragraph (7) cannot be said to leave paragraphs (12) and (16) without any purpose or effect in § 113(a), for these two paragraphs also have relation to acquisitions of property in other tax-free types of transactions, which are outside the category of qualified reorganizations. Then, too, in their relation to reorganization acquisitions, the provision which they make for recognition of the basis acquired for any property under the Revenue Act of 1932, or that of 1934, seems to us capable of being read, naturally and legitimately, in the continuing of reorganization tax-privilege by the Code—which has, as previously stated, been done by each separate Revenue Act since 1918—as merely calling attention or giving emphasis to these two then most-recent additions to or inclusions in the general reorganization area which had come to exist from all Revenue Acts since 1918. Such calling of attention or giving of emphasis is a practice in which legislatures are not without wont in engaging, cautionarily or some times even wholly redundantly, in making recognition or extension of some right or privilege.

But beyond these aspects, if we are correct in our view, as we believe we are, that each subsequent Revenue Act has impliedly intended, in its provision allowing a reorganization basis under it, to accord recognition to the reorganization bases established by previous Revenue Acts, then section 113(a) (7) of the Revenue Acts of 1932 and 1934 must also be read as having similarly contained such an implied recognition when enacted, and the provision of paragraphs (12) and (16) of § 113(a) of the Code, giving recognition to such basis for property as had existed under the Revenue Act of 1932 and that of 1934, would carry with it the recognition so given by those Acts to the basis acquired under previous Revenue Acts as constituting a basis existing under the Revenue Acts of 1932 and 1934 for such previous reorganization property.

No further answer seems to us necessary to the contention which the Government has made. We may, however, add that we feel sure that the Government's position has never had any previous le-

gal acceptance. The term "basis" for property is not one which ordinarily has been used in tax statutes in relation to a momentary status. And it may further be noted that the Supreme Court, in Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, in considering whether a reorganized corporation owed deficiencies for a year to which a subsequent Revenue Act was applicable, tested the corporation's right to the property basis asserted by it, in relation to its reorganization status under the Revenue Act in force at the time the transfer to it occurred. Indeed, it also seems to us that the Regulations of the Treasury Department have themselves recognized the view taken in this opinion and are in collision with the Government's position here, in the provision of § 29.113(a) (7) —1 of Regulations 111, that "Section 113(a) (7) [of the Code] sets forth the conditions under which the basis of property acquired by a corporation after December 31, 1917, in connection with a reorganization as defined in section 112 (g), *or a corresponding provision of a prior Revenue Act,* is the same as it would be in the hands of the transferor, increased or decreased as therein provided in the amount of gain or loss recognized as to the transferor under the applicable revenue law. * * *" (Emphasis ours.)

The conclusion reached on this contention of the Government makes it unnecessary to discuss any of its other contentions, except the one that the taxpayer's acquisition here must in any event be held, on the incidents involved, to have legally been nothing more than a mere purchase of the property. We agree with the trial court that the series of transactions under which the taxpayer acquired ownership of the railroad property fell within the "family of financial readjustments" which had been left open by the Revenue Act of 1918, as constituting a reorganization of an insolvent corporation. That Act contained no legislative definition of the term "reorganization", and it accordingly left the term,

for purposes of recognizing the status, as a matter of general legal concept, in due relationship to the fact of a tax privilege being involved and to the need for a continuity of proprietary interest to exist, such as has judicially been held, by Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, and subsequent cases, to be a general requisite in any such situation.

Here, the taxpayer's predecessor, which had been operating a small railroad line in the state of Minnesota, went into voluntary receivership in 1916, after it became necessary for it to default upon the interest due on its outstanding collateral trust notes and its gold bonds. The collateral trust notes were in the face amount of $750,000, and the gold bonds were in the face amount of $1,-000,000. The gold bonds represented the security for the collateral trust notes, and a deed of trust upon the railroad property secured the gold bonds.

After the appointment of a receiver, the trustees under the collateral trust agreement and under the deed of trust instituted separate foreclosures, both of which suits the court consolidated with the receivership proceeding. Operation of the railroad was continued by the receiver, down to the time that the property was deeded and transferred by him to the taxpayer, under order of court, on August 6, 1918. The taxpayer has owned the property and operated the railroad ever since.

Prior to the conveyance and transfer to the taxpayer, a decree of foreclosure and sale had been entered in the foreclosure proceedings, and the property was advertised and put up for sale at auction on June 28, 1917, but there were no bidders. Thereafter, on July 6, 1917, the receiver and a committee created to represent the holders of the collateral trust notes (referred to herein as the Noteholders Committee) recommended to the court that the railroad line be abandoned and that the property be dismantled and sold for junk. To enable this to be done, if necessary, the court ordered that the property again be offered

at public sale, and the Noteholders Committee thereupon submitted a bid for part of the property, subject to the condition that they were to be allowed to dismantle it. No bids were made by anyone for the remainder of the property.

Following these sale proceedings, which occurred in December, 1917, a group of patrons of the railroad and of civic-minded citizens in Minneapolis, who were desirous of saving the line from being abandoned, and who had organized themselves into a Contributors Committee for that purpose, filed protests with the court to any dismantling of the property and undertook to engage in negotiations with the Noteholders Committee. The court thereupon withheld further action upon the questions of dismantling the railroad, of accepting the bid made by the Noteholders Committee at the foreclosure sale, and of attempting to effect disposition of the rest of the property.

On May 6, 1918, a deal was arrived at between the Contributors Committee and the Noteholders Committee, by which the members of the Contributors Committee were to become the owners, with a right to assign the interest being acquired by them, of all of the collateral trust notes and of the foreclosure-suit rights in relation thereto, including the bid which the Noteholders Committee had made at the foreclosure sale. The taxpayer corporation was thereupon organized by the members of the Contributors Committee, and assignment was made to it of the rights which the Contributors Committee had thus acquired, with the members of the Committee individually becoming the sole stockholders of the corporation, in the amount which each had contributed to the payment made to the Noteholders Committee. The amount which the Contributors Committee had paid to the Noteholders Committee was $50,000, with a balance of $175,000 to be subsequently paid, which balance was paid by the corporation to the Noteholders Committee with money borrowed by it for that purpose.

All of these things were duly reported to the court, with a request for confirmation in favor of the corporation, as assignee, of the bid made by the Noteholders Committee at the previous sale, and for the holding of another sale to enable the new corporation to bid in the rest of the property. At the subsequent sale so held, the corporation bid in the remaining property, and confirmation of sale of all of the railroad property to it was duly made by the court, with directions to the receiver to execute a conveyance in its favor. Payment of the amount of the bids involved in both sales was allowed by the court to be made in the form of a credit endorsed upon the gold bonds securing the collateral trust notes. The taxpayer, as has previously been stated, has ever since owned and operated the railroad line and property.

The predecessor corporation concededly was insolvent to the point that no margin or equity of proprietary interest in the corporation's property or business remained to its stockholders. In this situation, the holders of the collateral trust notes were entitled, on a legal assertion of their rights against the corporation, to step into the stockholders' shoes for purposes of effecting any reorganization of the railroad and taking over its business and property, which was possible in the situation and which they might desire to undertake. Cf. Helvering v. Alabama Asphaltic Limestone Co., supra, 315 U.S. 179, 184, 62 S.Ct. 540, 86 L.Ed. 775; Helvering v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985, 987.

The Government argues in effect that the institution of foreclosure by the holders of the collateral trust notes automatically put and left them in the shoes of the stockholders, for purposes of any reorganization which would be capable of having its birth out of the foreclosure proceedings, and that the Contributors Committee could therefore not acquire any rights in the collateral trust notes or in the foreclosure suit, without causing a break in the continuity of interest necessary to the effecting of a tax-free

reorganization. The fallacy of this argument is that the foreclosure steps taken by the Noteholders Committee were admittedly not intended, for reorganization, but for liquidation purposes, and that there never had been any reorganization purpose or plan whatever on the part of the Noteholders Committee, which the Contributors Committee could pick up or be regarded as undertaking in any manner to carry out.

The institution of the foreclosure suit therefore did not in any sense constitute a step that had been engaged in as an incident to a reorganization of the railroad. Nor was what had been done by the Noteholders Committee in the foreclosure suit even in any way controlling in its consequence of what reorganization course would have to be pursued in relation to the corporation, if one should thereafter be undertaken. The Contributors Committee, after acquiring the interest of the Noteholders Committee, could have sought a vacation and dismissal of the foreclosure proceedings and, as the trial court said, have resorted to some reorganization plan entirely disassociated from the instituted foreclosure. Or they might have obtained a dismissal of the pending foreclosure and then have instituted another one in their own right, as an incident of a reorganization plan devised by them. In neither of these situations would there be anything existing on the part of any proprietary interest, except themselves, which could be said to have any tie or bear any relationship to a reorganizing of the corporation. And since the institution of the foreclosure suit by the Noteholders Committee had not borne any relationship of purpose or effect to a reorganizing of the corporation, and since the acquiring of the collateral trust notes and foreclosure-suit rights by the Contributors Committee had been without any qualification or obligation in respect to their use against the corporation, we are unable to see how the subsequent inclusion of the pending foreclosure proceedings by the Contributors Committee as a facilitating instrument or incident in the accomplishing of the reorganization plan devised by them can realistically be said to represent any different situation.

On the basis of what has been said, we conclude that the purchase made by the Contributors Committee of the collateral trust notes and the foreclosure-suit rights of the Noteholders Committee, at the time and in the circumstances involved, entitled the Contributors Committee to effect a tax-free reorganization of the old corporation; that what was done by them, in the payment made to the Noteholders Committee, in the organization of the taxpayer corporation, in the assignment to it of the proprietary interests so acquired by them, in the use of the pending foreclosure suit to effect the vesting of title to the property in the new corporation, and in the issuance of capital stock to them, as the then sole stockholders of the new corporation, for the amount which they had personally paid out to Noteholders Committee on the purchase price—all as steps or incidents of the reorganization plan which they had devised in relation to preserving the enterprise of the old corporation, and which had been without any semblance of reorganization existence or incipiency until the acquiring by them of their proprietary interest—gave rise to a tax-free reorganization under the Revenue Act of 1918, in effect at the time all of these events occurred; and that the basis which the Revenue Act of 1918 thereby permitted to be established in the taxpayer corporation for the property was one to which Congress had impliedly given recognition in respect to the tax years involved, under § 113(a) (7) of the Code.

These conclusions leave no substance in the Government's other contentions, sufficient to call for any lengthening of this opinion.

Affirmed.

## On Petition for Rehearing

Before SANBORN, JOHNSEN, and VOGEL, Circuit Judges.

JOHNSEN, Circuit Judge.

Some contentions were made in the Government's original brief, which we felt were without merit, and which, in the interest of brevity, we disposed of with a statement, in relation to the views we had expressed, that "These conclusions leave no substance in the Government's other contentions, sufficient to call for any lengthening of this opinion."

On petition for rehearing, it appears that the Government earnestly believes that we either misunderstood or misevaluated one, in particular, of these contentions, and that, had we engaged in a discussion of it, we would have been compelled to reach a different result in the case.

The contention was to the effect that no tax-free basis for property acquired by a corporation in connection with a reorganization could possibly have been intended to be established by the Revenue Act of 1918, 40 Stat. 1057, because there was no provision in the Act allowing a non-recognition of gain or loss to the transferor; that, in the absence of such a provision, the old corporation in the situation here involved necessarily had—so the Government's brief said—"sustained a loss equal to the difference between its adjusted cost basis for the properties ($2,354,008.98) and the $225,-000 its noteholders received"; and that the latter amount (which was paid by the Contributors Committee to the Noteholders Committee for an assignment of the collateral trust notes) therefore would in any event have had to constitute the new corporation's basis for the property.

We were of the view, as our opinion indicated, that Congress had intended, in the Revenue Act of 1918, to open the door to a corporation's use, for property acquired by it in connection with a reorganization, of the same basis which the property had in the hands of its transferor. The Act was not as perfect or complete as it might have been, in that it left a number of things to implication instead of making them the subject of direct expression. Thus, as we observed, there was no definition of the term "reorganization", such as Congress specifically engaged in as to later Revenue Acts, but it was our conclusion that, in not having included a special definition, Congress had "left the term, for purposes of recognizing the status (under the 1918 Act), as a matter of general legal concept, in due relationship to the fact of a tax privilege being involved and to the need for a continuity of proprietary interest to exist, such as has judicially been held * * * to be a general requisite in any such situation."

We could appropriately have added in the opinion that it seemed to us that Treasury Regulations 45, Articles 1567 and 1568, promulgated under the Revenue Act of 1918, had, at least in some measure, accepted such an underlying concept for the Act. And we might perhaps also relevantly have said that, in reaching the view that we did, we felt that it was not without significance that Congress had continuously since 1924, in according such a tax privilege as is involved to any reorganizations which should occur under the current Revenue Act which it was enacting, seen fit to make the privilege granted under each Act bear reference or relationship to the commencement of such a privilege by the 1918 Act, in its use and repeating in each Act of the language, "property * * * acquired after December 31, 1917, by a corporation in connection with a reorganization".

Any reading of the 1918 Act revealed, of course, that, in its pioneer according of this reorganization tax-privilege, Congress had not assumed to include a requirement, such as it has done in all Revenue Acts since 1924, that the transferor's basis for property acquired by a corporation in connection with a reorganization should, in the hands of the transferee, be "increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer". 26 U.S.C.A. § 113(a) (7). It seemed obvious to us that Congress might, if it chose, and could proper-

ly be regarded as having so done in not making that requirement in the 1918 Act, permit a transferee to take over a transferor's basis for reorganization property, as of the time the transfer occurred, without regard to whether or not any loss would thereby result to or be entitled to be claimed by the transferor (here an insolvent railroad corporation, which presumably was thereafter dissolved) for its own tax purposes. In fact, it appeared to us that the Treasury Department had itself, from the implication of some of the language used in Treasury Regulations 45, Article 1568, at that time held this very view.

We stated in our opinion that we believed that "if Congress had intended the definition of 'reorganization' adopted in any subsequent Revenue Act to have application other than as a standard for reorganizations occurring under that particular Act, it would have so stated, or in some other manner have given compelling indication of such an intent * * *." Thus, Congress appeared to have in this manner done that very thing, we thought, when, among other things, it reached out, for the first time, by section 113(a)(12) and (16) of the Internal Revenue Code of 1939, 26 U.S.C.A., to extend to any property acquired in reorganization, back as far as February 28, 1913, (that date being before the Revenue Act of 1918 had application, and there having been no tax-free basis for such property, as a matter of reorganization, established by the preceding Revenue Acts of 1913, 1916 and 1917) a reorganization tax-basis, if it was able to qualify under the standards laid down by either of those sections, although such property had previously been without the right to an established basis of this nature under the standards or the lack of privilege in such Revenue Act as was in force at the time the reorganization occurred.

But beyond all this, and apart from it, we were unable to see how there could at all be any merit in or basis for the Government to argue, as a segment of its contention and as a composite of the result which it was seeking to have us reach on the general question, that the price paid to the holders of the collateral trust notes by the Contributors Committee, for a purchase and assignment of their securities and the rights incident thereto, would legally provide the basis for a loss deduction by the old corporation, after it lost its property by the foreclosure had upon the securities. The sale of their securities by the holders to the Contributors Committee could of course give rise to a deductible loss to the security holders personally, but we felt that it was hardly necessary to make any answer to a contention that a loss sustained by the holders of securities or stock in a corporation on a sale thereof would, if the purchasers thereafter made use of the securities to effect a reorganization of the corporation and a transfer of its property, give rise also to a right of deduction in favor of the corporation for any loss which the previous holder may have had from the sale made by them of their securities.

The rest of the Government's petition for rehearing is a reargument of or disagreement with the conclusions reached by us in our opinion—principally upon the question of continuity of proprietary interest. This we feel there is no occasion for us further to discuss.

The petition for rehearing is denied.