**SELECT THEATRES CORPORATION, Plaintiff,**

v.

**James W. JOHNSON, Collector of Internal Revenue, Defendant.**

United States District Court
S. D. New York.
Sept. 29, 1956.

Victor R. Wolder, New York City, for plaintiff.

. J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City (Thomas C. Burke, Asst. U. S. Atty., New York City, of counsel), for defendant.

BICKS, District Judge.

Plaintiff claims to have overpaid income and excess profits taxes for its fiscal year ended June 30, 1943 by $143,069.79 and brings this suit to recover the alleged overpayment. Its right to prevail turns principally upon whether certain of its assets were acquired in a tax-free reorganization.

The Internal Revenue Code of 1939, section 710, 26 U.S.C.A. Excess Profits Taxes, § 710, imposed a tax on the "adjusted excess-profits net income" of corporate taxpayers. Broadly speaking, this was the taxpayer's net income for the year, reduced by a credit deemed to represent the normal or non-excess earnings. Taxpayers were permitted a choice of basis of computing the credit, either on average earnings during the pre-war period 1936 to 1939, or on a return on the amount of capital invested in the enterprise. Plaintiff chose to employ the latter method in determining its tax liability for the tax year under review. It asserts, however, that the credit was computed on what it erroneously conceived to be its "invested capital" with the result that the credit to which it was entitled was grossly understated.

For the fiscal year here involved plaintiff filed a consolidated income and excess profits tax return, covering the operations of itself and its twenty-two

wholly-owned subsidiaries [1] which disclosed a liability for taxes in the following amounts, all of which were paid:

Income Tax $57,712.73
Declared Value Excess Profits
 Tax 2,352.74
Excess Profits Tax 132,178.18
 —————
 $192,243.65

On December 6, 1946 plaintiff filed a claim for refund of $44,963.42. An amended claim increasing the amount of refund demanded to $142,999.79,[2] was filed on July 16, 1948.

Section 718(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 718(a) provides that the invested capital credit is determined by referring to the property *paid into* the corporation "for stock, or as paid-in-surplus, or as a contribution to capital", and including the same "in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." Under Section 760 of the 1939 Code the basis to the transferee of property *transferred* in a tax-free exchange is determined by reference to the basis of such property in the hands of the transferror or predecessor corporation.[3] Plaintiff paid $400,000 for the assets in question. The basis thereof in the hands of its vendor was upwards of $4,000,000. In the tax return as filed taxpayer treated the amount it paid for the assets as its invested capital. The claim for refund is predicated on an invested capital in an amount equal to the vendor's basis for said assets.

Shubert Theatre Corporation (referred to herein as "Shubert") was organized in 1924 for the purpose of taking over the theatrical enterprises which had been conducted for approximately twenty-five years by Messrs. Sam S., Lee and J. J. Shubert. It was one of the principal producers of so-called "legitimate" theatrical attractions in the United States and the largest operator of "legitimate" theatres. The business had been highly profitable and continued so through its fiscal year which ended June 30, 1929. The severe decline in the securities markets in the last quarter of 1929 and the general business depression which followed had a marked adverse effect on the theatrical industry, Shubert included. For the fiscal year ended June 30, 1930, it sustained a net loss of $1,231,000, for the succeeding fiscal year $1,672,000; and for the period July 1, 1931 to October 20, 1931, $1,187,000; a loss in the aggregate during this period of approximately twenty-eight months, of $4,090,000. Shubert then found itself unable to discharge its obligations as they matured with the result that on October 20, 1931, a bill of complaint in an equity receivership proceeding was filed in this court by a general creditor. Shubert's answer admitted the allegations of the complaint and joined in the prayers for relief contained therein. Irving Trust Company, a New York banking corporation, and Lee Shu-

---

1. Plaintiff, during the taxable year, owned all of the issued and outstanding stock of the following corporations: Select Operating Corporation; Barrymore Theatre Corp.; Century Library, Inc.; Forrest Theatre Company of Phila.; Jayson Building Co., Inc.; Modern Theatre Corporation; 635 Greenwich Street Co., Inc.; 620 W. 47 St. Corp.; Stage Costumes, Inc.; Select Lake City Theatre Operating Co.; Acre Realty Co., Inc.; Louisville Amusement & Operating Co.; Opera Under the Stars, Inc.; Sam S. Shubert Amusement Co. Inc.; Walnut & Quince Sts. Corp.; Dee Theatre Corporation; Detroit Downtown Theatre Corporation; Performing Rights Society of the Theatre, Inc.; April Productions, Inc.; Continental Music Publishing Co., Inc.; Operatic Festival, Inc.; Ddot Theatre Corporation.

2. The parties have stipulated, and the pretrial order provides, that the computation of the amount, if any, to be recovered by plaintiff shall await the determination of the legal issues involved.

3. Internal Revenue Code of 1939, section 760(a), 26 U.S.C.A. Excess Profits Taxes § 760(a), and § 113(a) (7), 26 U.S.C.A. § 113 (a) (7).

bert, were thereupon appointed receivers.[4]

At the date the receivership proceedings were instituted Shubert's liabilities consisted of $6,360,000. 6% gold debentures due June 15, 1942; $323,000. accumulated interest on said debentures; $1,158,000. notes and accounts payable; Federal amusement taxes payable $9000; and $284,000. deferred credits.[5] The capital stock consisted of 218,160 shares without par value of which 210,360 were issued and outstanding and 7800 were held in the treasury. Messrs. Lee and J. J. Shubert owned, either directly or indirectly, 71,680 shares of Shubert stock (34% of the total outstanding shares); $619,000 principal amount of Shubert 6% gold debentures (9.7% of the total outstanding debentures); and $660,000 of other debt.

During the operation of the business by the receivers the liquid assets continued to dwindle. In order to provide funds for payment of the expenses of administration and the continued operation of the business, the receivers were authorized in April 1932 to create a second issue[6] of interest bearing certificates of indebtedness or receiver's certificates in a principal amount not in excess of $400,000 maturing not later than March 1, 1933, and to sell all or any part thereof up to $300,000 in principal amount. The order provided, *inter alia*, that (i) the certificates shall not impose any personal liability on the receivers otherwise than as receivers of Shubert; (ii) the certificates shall be secured by (a) a direct charge upon the receivership estate, (b) a lien upon all the assets in the possession of the receivers, subject and subordinate to all valid liens on any part of the assets covered thereby existing at the date of the appointment of the receivers, but prior and superior to the 6% gold debentures due June 15, 1942, and all other unsecured debts, (c) such charge and lien shall rank equally with the charge or lien of all other obligations of the receivers incurred in the operation of the business, except administration expenses, which, by operation of law, may be entitled to priority thereto, (d) such charge or lien shall not, so long as the receiver shall not be in default in the payment of said certificates when due, limit or restrict the right of the receivers to dispose of any assets then in their hands or which may thereafter come in their hands in the conduct of the business, or to apply such assets or the proceeds thereof to the payment of expenses and indebtedness incurred by the receivers in the conduct of the business, (e) all the certificates, at the election of the holders thereof, shall become immediately due and payable upon any sale of the assets in satisfaction of any final decree and the termination of the receivership, or in the event that Shubert shall be adjudged bankrupt and (f) the receivers were authorized, by agreement with the holders of the certificates, to extend the maturity date for a period not exceeding three months from March 1, 1933.

The entire issue of said receivers' certificates was sold to The Atel Co., Inc., hereinafter referred to as "Atel". Atel was organized on March 23, 1932 under the Laws of the State of New Jersey. At least from May 1932 all its outstanding stock was owned by Dorsar Enterprises, Inc., a New York corporation,

---

4. Subsequent to October 20, 1931, the receivership was extended to include all of Shubert's wholly-owned subsidiaries.

5. Mortgages on real estate totaling $10,749,000 and accrued interest thereon are omitted, it not appearing whether and to what extent, if any, Shubert was liable for deficiencies. Real estate taxes totaling $493,000 likewise are omitted—the City of New York may look for collection only to the property on which the tax liens attach. Haight v. Mayor, 1885, 99 N.Y. 280, 1 N.E. 883; People ex rel. Meyers v. Moynahan, (1st Dept.), 1909, 130 App.Div. 46, 114 N.Y.S. 417. See Paddell v. City of New York, 1908, 211 U.S. 446, 29 S.Ct. 139, 53 L.Ed. 275.

6. A first issue of certificates in the amount of $50,000 was sold during the period October 28, 1931 to February 1, 1932. These certificates were retired, with interest, and are not involved in this case.

which was 100% owned by the Shuberts individually. The funds employed by Atel for the purpose of purchasing the receivers' certificates came to it by loan from Dorsar Enterprises, Inc., the latter having previously borrowed a like sum from the Shuberts. Atel was neither a stockholder nor creditor of Shubert or any of its subsidiaries.[7]

Efforts in the direction of effecting a reorganization met with no success. The amount of cash and the value of assets readily convertible into cash in the hands of the receivers continued to decline. In the opinion of the receivers further operation of the business might have resulted in further losses. Thus circumstanced, the receivers on January 4, 1933 recommended that the properties and assets in their hands be sold and the proceeds thereof distributed among those entitled thereto. Upon the petition of the receivers a decree was made under date of January 21, 1933, directing that, the assets be sold, either in bulk or in separate parcels, to the highest bidder or bidders (in case of a bulk sale an upset price of $400,000 was fixed); any creditor or any stockholder, director or officer of Shubert may purchase the assets in his own right, and Lee Shubert, one of the receivers, may likewise bid at such sale, or may be interested in any corporation that shall bid thereat and he or any such corporation may purchase the assets in his or in its own right provided that he shall have resigned as receiver prior to the date of the sale; and further, that

"no sale of the * * * assets * * * shall be confirmed to any purchaser on behalf of, or for the benefit of, any corporation organized or to be organized with the intention that it shall become the owner of said * * * assets * * * pursuant to any plan or agreement of reorganization unless at or before the sale * * * such purchaser shall have filed with the Special Master a complete copy of such plan or

arrangement * * * and no sale of any property * * * to any purchaser who is to purchase such property pursuant to any such plan or agreement shall be confirmed if the Court shall determine that the provisions of such plan * * * are inequitable * * *. So much of the purchase price as may not be required by the Court to be paid in cash may be paid in whole or in part by delivery to the Special Master, * * * outstanding Receivers' Certificates of Indebtedness and/or claims allowed * * *, including claims in respect of the 6% Gold Debentures * * *. The purchaser shall be credited on account of the purchase price with such sum * * * as would be payable in cash, out of the proceeds of the sale, in respect of said Receivers' Certificates of Indebtedness. Debentures, * * * and other claims, if the whole amount of the purchase price were paid in cash."

Lee Shubert removed any disqualification to become a bidder at the sale or interested in the purchaser by resigning as receiver. The sale pursuant to said decree originally scheduled for February 24, 1933 was adjourned from time to time to April 7, 1933. As a condition to the last adjournment Lee Shubert bound himself to bid or cause to be bid not less than $400,000 for the assets held in the receivership estate. At the sale the assets were struck down in bulk to the only bidder—Select Theatres Corporation, the plaintiff herein, for $400,000. Upon the Special Master's report of sale and petition of the plaintiff herein a decree was entered confirming the sale. The petition recited that plaintiff intended to deliver the receivers' certificates to the Special Master on account of the purchase price and prayed that the Special Master be directed to credit on account of the purchase price such sums as would be payable out of the proceeds of sale in respect of said receivers' certificates if the

---

7. It does not appear from the record whether Dorsar Enterprises, Inc., was a stockholder or creditor of Shubert or any of its subsidiaries.

whole amount of the purchase price were paid in cash. The confirmatory decree authorized the Special Master to accept said certificates as pro tanto payment of the purchase price. It recited further

"it appearing to the Court that said Select Theatres Corporation has not been organized with the intention that it shall become the owner of the properties and assets of defendants, or any part thereof, or any beneficial interest therein, pursuant to any plan or agreement of reorganization, and does not propose to purchase said properties and assets, or any part thereof, on behalf of, or for the benefit of, any other corporation organized or to be organized with such intention."

Select Theatres Corporation, the successful bidder, was organized on April 5, 1933, two days before the sale. Its original authorized capital stock consisted of 200 shares of common stock without par value. At its first meeting the Board of Directors accepted an offer by Atel to purchase 101 shares of its common stock for $404,000 to be paid, $300,000 by delivery of the receivers' certificates and the balance, less accrued interest on said certificates in cash. On April 17, 1933, the subscription agreement was modified. Under the amended agreement Atel subscribed to 140 shares for $14,000 and agreed to loan to the company $390,000 (in cash and the aforesaid receivers' certificates), against its one year note.

The purchase at the Special Masters sale was consummated on April 25, 1933. Payment of the purchase price was made by delivery of the receivers' certificates duly endorsed, plus $90,009.52 in cash [8] representing the difference between the principal amount of the receivers' certificates plus accrued interest and the $400,000 purchase price. The cash proceeds of the sale were applied to the payment of expenses of administration by the estate in receivership after which no amount whatever remained available for distribution among the creditors or stockholders of Shubert.

On or about May 31, 1933 Lee Shubert addressed a communication to the creditors and stockholders of Shubert, stating in part:

"When the Court decided that the assets of the Corporation were to be sold at public auction, we offered the security holders a plan of reorganization, but the subscriptions were insufficient to carry it through. Consequently, the assets were purchased by Select Theatres Corporation (in which I have a substantial interest) for the upset price fixed by the Court—$400,000. No other bidder appeared at the sale. The sale was confirmed by the Court, and the transfer of the assets has been substantially completed.

"Select Theatres Corporation will be recapitalized with an authorized capital to consist of $400,000 of 6% non-cumulative preferred stock, which may be issued up to the full amount of the price paid for the properties ($400,000), and 200,000 shares of common stock, with a nominal par value, both classes of stock being entitled to one vote per share.

"The stockholders of Shubert Theatre Corporation will, of course, receive nothing as a result of the sale of the Corporation's assets. Debenture holders and other creditors are entitled to their pro rata share of the purchase price after payment of expenses and Receiver's obligations; but it now appears likely that very little, if anything, will be available for distribution to debenture holders and other creditors when the receivership is finally wound up.

"Nevertheless, it is my earnest desire that those who invested their

---

**8.** This cash was obtained in the same manner as the cash originally employed to purchase the receiver's certificates, i.e., the Shubert partnership advanced the same to Dorsar Enterprises, Inc., which in turn advanced the funds to Atel, and the latter supplied them to plaintiff.

money in Shubert Theatre Corporation, under my management, shall have an opportunity to participate in the new company, and to benefit with the return of prosperity, if such time arrives. Accordingly, I have arranged for the issuance of 50% of the common stock of Select Theatres Corporation to security holders and creditors of Shubert Theatre Corporation, without cost to them.

"This stock, the greater portion of which would otherwise become part of my personal holdings, will be distributed on the following bases:

10 shares of common stock of Select Theatres Corporation in respect of each $1,000 debenture (with June 15, 1931, and subsequent coupons attached) of Shubert Theatre Corporation;

1 share of common stock of Select Theatres Corporation in respect of each $105 of allowed claims against Shubert Theatre Corporation;

1 share of common stock of Select Theatres Corporation in respect of each 10 shares of common stock of Shubert Theatre Corporation.

\* \* \* \* \* \*

"Security holders and creditors of Shubert Theatre Corporation availing themselves of this offer should forward their securities or allowed claims to me in care \* \* \* I will not take title to the securities and claims so forwarded but, acting as agent for the holders thereof, will surrender them to Shubert Theatre Corporation for cancellation. No transfer stamps or other expenses will be payable by those who take advantage of this offer. The debentures and allowed claims will not be canceled until it is definitely known whether or not there will be anything available for distribution to the holders thereof. If anything should be available, I will collect the amount due upon the debentures and allowed claims surrendered by those who have accepted my offer, and will turn over to them the amounts which they are respectively entitled to, less expenses incurred by me in that connection."

To permit of issuance of the stock in accordance with said letter plaintiff caused its authorized capitalization to be modified to consist of 40,000 shares of 6% non-cumulative preferred stock par value $10 per share, and 200,000 shares common stock par value 10 cents per share. The 140 shares of common stock no par value, previously authorized to be issued, were exchanged for 1,400 shares of preferred stock. Atel's subscription agreement as previously amended was further modified. Instead of loaning plaintiff $390,000, Atel subscribed to 36,-650 shares of preferred stock and 200,-000 shares of common stock and agreed to pay therefor $366,500 and $20,000 respectively. 100,000 shares of said common stock were set aside for distribution to the debenture holders, general creditors and stockholders of Shubert in accordance with the offer contained in Lee Shubert's letter. Of the shares of common stock thus set aside an aggregate of 79,731 shares were ultimately distributed among the holders of $5,472,000 principal amount of the 6% debentures (over 86% of the total amount outstanding); the holders of $692,963.20 face amount of general claims (over 63% of the total claims allowed in the receivership); and the holders of 175,361 shares of the capital stock of Shubert (over 82% of the number of shares outstanding), in the amounts and proportions set out in the aforementioned letter. The remaining 20,629 shares of common stock were ultimately issued to Atel. It would appear, therefore, that the cost to Atel of 38,050 shares of preferred stock and 120,269 shares of common stock, was $400,500. Ascribing to the preferred stock its par value, approximately 60% of the common stock of plaintiff cost Atel $20,000.

In response to an inquiry from a Shubert stockholder who had accepted the offer set forth in Lee Shubert's letter, plaintiff's treasurer under date of March

31, 1936, advised him that the shares of Select Theatres Corporation he received was purely a gratuitous offer by Lee Shubert, the stock did not originate from Shubert Theatre Corporation, the stock was not offered under any plan of reorganization and that the offer of stock was made subsequent to the sale of the assets. The letter in full, is set forth in the margin.[9]

Plaintiff's origin and background have been developed at length because of the claim that, with these credentials plaintiff may gain entry into the golden circle of corporate legatees. The conclusion is inevitable, however, that its ancestor, Shubert, was put to death on the auction block under circumstances that plaintiff may not collect its claimed inheritance— a "basis windfall" giving it a basis for its assets far above the market value thereof at the time of acquisition and upwards of ten times the amount it paid for them.

Plaintiff does not, and indeed cannot, urge that the gratuitous distribution of a portion of its voting securities to former creditors and stockholders of Shubert was in pursuance of or constituted a plan or agreement of reorganization. Its claim in essence is that plaintiff's ownership of the receivers' certificates, the order authorizing the Special Master to accept, and his acceptance of, the receivers' certificates as payment on account of the purchase price in lieu of cash, constituted a tax-free reorganization under Section 112 of the Revenue Act of 1932, 26 U.S. C.A. § 112.

This contention is challenged by the defendant. It urges that the ownership of the receivers' certificates did not confer upon plaintiff an "equity" in Shubert and that there is lacking the "continuity of interest" necessary to support a tax-free reorganization.

The 1932 Act, Section 112(i), defines a reorganization, insofar as here material, thusly:

"The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation) * * *".

Whether a transaction qualifies as a reorganization under the Revenue Act does not turn alone upon a compliance with the literal language of the statute. Commissioner of Internal Revenue v. Gilmore's Estate, 3 Cir., 1942, 130 F.2d 791. The words of the statute within the parentheses expand the meaning of "merger" or "consolidation" so as to include some transactions which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation. Pinellas Ice & Cold Storage Co. v. Commissioner, 1933, 287 U.S. 462, 470, 53 S.Ct. 257, 77 L.Ed. 428. In the Pinellas case the transfer of assets from one corporation to another for well secured short-term notes like the purchase for money of the assets of one company by another, was held to have no real resemblance to a merger or consolidation and beyond the evident purpose of the statute. It was subsequently held that the term of the obligation, whether long-term bonds or short-term notes is not material. LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. Unless the transferror retains a definite

9. "Your letter of March 27, 1936, addressed to Mr. Lee Shubert has been referred to me for attention. As former comptroller of the Shubert Theatre Corporation and as present Treasurer of the Select Theatres Corporation, I am in a position to give you the information requested.

"Your understanding that the ten shares of Select Theatres Corporation which you received, was purely a gratuitous offer by Mr. Lee Shubert, is correct. The stock did not originate from the Shubert Theatre Corporation nor was it offered to you under any plan of reorganization. The assets of the Shubert Theatre Corporation were sold in the receivership proceedings and were entirely insufficient to meet its debts and such sale did occur prior to the offer of the ten shares of stock."

and substantial proprietary interest in the enterprise,[10] the transfer does not amount to a reorganization within the true meaning of the statute, but is a sale upon which gain or loss must be reckoned. Pinellas Ice & Cold Storage Co. v. Commissioner, supra; Helvering v. Minnesota Tea Co., 1935, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; LeTulle v. Scofield, supra.

The problem of "continuity of interest" was considered by the Courts principally from the single aspect of what the old proprietors must receive in the new enterprise. But with the profusion of distress reorganizations engendered by the economic depression of the early 1930's it became necessary to explore another element of the problem, to wit, who are the old proprietors. The latter problem is the crucial one here.

The problem of the identity of the old proprietors was first presented to the Supreme Court in a group of cases decided in 1942. Helvering v. Alabama Asphaltic Limestone Company, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; Palm Springs Holding Corporation v. Commissioner, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785; Bondholders Committee etc. v. Commissioner, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784; Helvering v. Southwest Consolidated Corporation, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789. The first two of said cases are the significant ones here.

In the Alabama case the respondent acquired all the assets of an insolvent corporation pursuant to a creditors plan of reorganization consummated with the aid of the bankruptcy court. At the sale by the bankruptcy trustee the creditors committee was the successful bidder. The price was paid in substantial part by agreements of creditors to accept stock of a new corporation in full discharge of their claims and by an offer of the committee to meet the various costs of administration. Pursuant to the plan all the stock of the respondent was distributed among the creditors of the bankrupt company. The Government contended that the requisite continuity of interest was broken because the stockholders of the bankrupt corporation were eliminated by the plan (no portion whatever of their proprietary interest having been preserved for them in the new corporation) and hence there was "no reorganization". Recognizing that the old continuity of interest had been broken, the Court held [315 U.S. 179, 62 S.Ct. 543] that it was

"immaterial that the [bankruptcy sale] shifted the ownership of the equity in the property from the stockholders to the creditors of the old corporation. Plainly the old continuity of interest was broken. Technically that did not occur * * * until the judicial sale took place. For practical purposes, however, it took place not later than the time when the creditors took steps to enforce their demands against their insolvent debtor. In this case, that was the date of the institution of bankruptcy proceedings. From that time on they had effective command over the disposition of the property. The full priority rule of Northern P. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, applies to proceedings in bankruptcy as well as to equity receiverships. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. It gives creditors, whether secured or unsecured, the right to exclude stockholders entirely from the reorganization plan when the debtor is insolvent. See In re 620 Church Street Bldg. Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16. When the equity owners are excluded and the old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership from the time when they in-

10. Receipt of preferred stock of the transferee corporation by the stockholders of the selling corporation has been held to represent a substantial continuation of their interest. John A. Nelson Co. v. Helvering, 1935, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281.

voked the processes of the law to enforce their rights of full priority. At that time they stepped into the shoes of the old stockholders. The sale 'did nothing but recognize officially what had before been true in fact.' Helvering v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985, 987."

The Palm Springs case was a companion one to the Alabama case and involved basically the same problem, although a different procedure was invoked to salvage the interest of the creditors. The decision in the Alabama case was held to be controlling. "The critical facts" held the Court "are that the old corporation was insolvent and that its creditors took effective steps to obtain command over its property. For the reasons stated in Helvering v. Alabama Asphaltic Limestone Co., supra, the creditors at that time acquired the equivalent of the proprietary interest of the old equity owner. Accordingly, the continuity of interest test is satisfied."

█ In the Alabama and Palm Springs cases, and those which followed them,[11] there arrived some point in time when it could be said that ownership of the corporation shifted to the creditors. Typically, the change of ownership takes the form of an assumption of control by a creditors committee, or by an indenture trustee acting for the benefit of bondholders after the formulation of a reorganization plan. The exercise by the creditors of their rights of priority, and of their right to take over the corporate assets to the exclusion of the stockholders, works a transfer of dominion which puts them in the place of the stockholders. When, following the bankruptcy or receiver's sale, the creditors take over the assets of the corporation and become the stockholders of the new corporation, they are merely continuing an equity relationship which had by then already existed.

█ This rationale is consistent with the concept reflected on a corporate balance sheet and stems from the relationship between a corporation and its creditors. On one side of the balance sheet there is set forth the assets of the corporation and on the other, first the interests of the creditors—the liabilities, and then those of the equity owners— whatever remains after deducting the liabilities from the assets. This balance is the capital of the corporation. Those who deal with the corporation look to its capital funds as a source of and security for payment of the debts due them. If insolvency intervenes and the creditors take effective steps to enforce their demand via a foreclosure or bankruptcy or reorganization proceeding they step into the shoes of the stockholders vis a vis the interests or equity of the latter in the totality of rights and assets of the company.

█ No case has been cited by counsel and independent research by the Court has failed to find one dealing with the status of a holder of receiver's certificates as a party to a reorganization. The dissimilarity between the origin and rights of the certificate holder and those of the corporate creditor make apparent that the reasons for relating creditors to stockholders are absent in the case of the former. The certificate holder did not deal with Shubert as such. The loan which is evidenced by the certificates was made to the receivers and not to Shubert. The rights of the certificate holder did not derive from Shubert and the ownership thereof carried with it no right to take any action against Shubert in the event the certificates remained unpaid. The receivers' certificates were not absolute promises to pay nor debts of Shubert. They were debts of the receivers in

---

11. See, e.g., Templeton's Jewelers, Inc., v. United States, 6 Cir., 1942, 126 F.2d 251; Rotenberg v. Sheehan, D.C.E.D.Mo.1943, 48 F.Supp. 584, appeal dismissed, 8 Cir., 1944, 144 F.2d 992; Braicks v. Hendricksen, W.D.Wash.1942, 43 F.Supp. 254, affirmed 9 Cir., 1943, 137 F.2d 632; Connohio, Inc., 9 T.C.M. 1105, 1950; Peabody Hotel Company, 1946, 7 T.C. 600. See also Helvering v. Cement Investors, Inc., 1942, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649.

their official capacity backed by the pledged faith of the Court that the proceeds of the property on which they were a charge, to the extent they were sufficient for that purpose, would be applied to their payment. See Clark, Receivers, §§ 459, 461 (2d ed. 1929).

Until the sale the receivers were, both in fact and in legal contemplation, attempting to rehabilitate Shubert for the benefit of its creditors existing at the time of the institution of the proceeding. In view of its insolvency only the creditors held the equity in Shubert during the receivership. Nor does the fact that the certificates were secured by a charge or a "lien" on the property of Shubert in the hands of the receivers add weight to the suggestion that the certificate holder possessed or exercised a proprietary interest. It was not such a lien as conferred powers of foreclosure or control. To say that the holders had a "lien" is to say only that they had a right to repayment out of whatever assets were available for that purpose prior to the unsecured creditors of Shubert. Until there is a default, a creditor's interest is not the equivalent of a proprietary interest notwithstanding that upon default the creditor may also enforce a lien upon specific property. True, insolvency of the debtor operates as an anticipatory breach of an executory agreement, Roehm v. Horst, 1900, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; Central Trust Co. v. Chicago Auditorium Association, 1916, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811, but here the certificate holder well knew it was making a loan to an insolvent estate in receivership. No term may be implied therefore, that the borrower would not permit itself through insolvency to become disabled from meeting its engagement. Absent such term, expressed or implied, the doctrine of anticipatory breach may not be invoked. Here the receivers' certificates were not due when the Special Master's sale was scheduled to be held. As already indicated Lee

Shubert individually committed himself to bid an amount sufficient to discharge in full the receivers' certificates with interest—an undertaking which the certificate holder was content to accept. Under the circumstances its interests could in no wise be affected by Shubert's insolvency.[12] Payment in full when due with interest having been satisfactorily provided for, the rights of the certificate holder were akin to those of a creditor of a solvent debtor. The best that can be urged (without intimating, however, that such a contention is sound) is that the certificate holder had a mere possibility of a proprietary interest but that, as the Court said in the Alabama case [315 U.S. 179, 62 S.Ct. 543], "is of course not its equivalent." Taking full account of the steps involved in the issuance of the certificates, the rights which they conferred and the use to which they were put to acquire the Shubert assets, there was no point in time prior to the receiver's sale when it can be said that plaintiff, as the holder of the certificates, had the right to or took effective command of the Shubert assets.

Plaintiff's brief argues that there is "no substantial difference whatever" between the instant case and Minneapolis, Northfield & Southern Railway v. Kelm, D.C.Minn.1953, 117 F.Supp. 325, affirmed 8th Cir.1955, 225 F.2d 909. In that case, a sufficient continuity of interest was found to exist despite changes in the ownership of creditors' claims during the pendency of the proceeding. As assignees, the new holders of the claims were held to be clothed with the same creditors rights and powers as had inured to their assignors. The new holders of the claims which antedated the commencement of the proceeding, were not divested of their right to reorganize the company merely because they became owners during the pendency of the proceeding. The Minneapolis case is similar to the case at bar in that the assignees of the creditors' claims, like the holder of

---

12. "A plan does not 'affect' the claims of creditors when they retain exactly what they had before". Gross v. Bush Terminal Co., 2 Cir., 1939, 105 F.2d 930, 932.

the receivers' certificates, acquired their respective rights after the institution of the proceedings. Here, however, the similarity ends. In the case at bar, with respect to plaintiff's assignor—the original holder of the receivers' certificates—continuity of interest was lacking; in Minneapolis with respect to the assignors—creditors whose claims arose out of dealings with the corporation prior to the institution of the proceeding—continuity of interest existed.

The facts are, of course, that as matters eventuated, there were no bidders at the Special Master's sale for the assets in separate parcels, they were struck down in bulk, the successful bidder was the holder of the receivers' certificates, the same were applied on account of the purchase price, and the purchaser has continued the business enterprise. The circumstance that at or about the time of the sale plaintiff acquired the receivers' certificates and obtained permission to apply them on account of the purchase price did not alter its status as a cash purchaser nor confer benefits upon it different than those that would inure to any cash purchaser. Indeed, its bid was for a fixed sum payable in cash and but for its application for leave to pay part of the purchase price by surrendering the certificates, they would have been fully discharged by payment in cash.

Before the Special Master's sale the certificate holder had no rights to the ownership of the assets in the hands of the receiver. Whatever rights of ownership it ultimately acquired stemmed from, and did not pre-date, the sale. The continuity of interest, therefore, was broken and no reorganization occurred.

 This leaves for consideration plaintiff's alternate position that if it is not entitled to include in its equity in-vested capital Shubert's basis of the assets it purchased at the Special Master's sale, it is entitled to include the basis of the stock, debentures and unsecured claims of Shubert in the hands of those who accepted the offer contained in the Lee Shubert letter discussed supra. Reliance for this alternate position is placed on § 113(a) (8) (B) of the Internal Revenue Code.[13] This position is clearly untenable: (1) Plaintiff acquired no property from the old stockholders and creditors who accepted Lee Shubert's offer. The offer was wholly gratuitous, was made by Lee Shubert individually, not by the plaintiff, and was made after the acquisition of the assets. Under the terms of the letter those who accepted the offer transferred no property to anybody, certainly not to the plaintiff. "Security holders and creditors of Shubert Theatre Corporation," wrote Lee Shubert "availing themselves of the offer should forward their certificates or allowed claims to *me* * * *. *I* will not take title to the securities so forwarded, but, acting as agent for the *holders* thereof, will surrender them to Shubert Theatre Corporation for cancellation." If any contribution was made by the old stockholders and creditors—and none could have been made since after the sale the old stock and the claims of creditors were valueless—it was made to Lee Shubert, not to the plaintiff. But there was no intention to pay in surplus or make a contribution to the capital of either Shubert or plaintiff—witness the following from Lee Shubert's letter "The debentures and allowed claims will not be canceled until it is definitely known whether or not there will be anything available for distribution to the holders thereof. If anything should be available, I will collect the amount due upon the de-

---

13. "§ 113. * * * (a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—
* * * * *
"(8) Property acquired by issuance of stock or as paid-in surplus. If the property was acquired after December 31, 1920, by a corporation—* * *

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

**596**

bentures and allowed claims surrendered by those who have accepted my offer, and will turn over to them the amounts which they are respectively entitled to, less expenses incurred by me in that connection." and his earlier statements in said letter "I have arranged for the issuance of common stock of Select Theatres Corporation to security holders and creditors of Shubert Theatre Corporation, without cost to them. This stock * * * would otherwise become part of my personal holdings. * * * " (2) Plaintiff did not issue any stock to the old stockholders and creditors who accepted Lee Shubert's offer. The stock which was delivered to them had been subscribed to and fully paid for by Atel which was entitled to have the same issued to it or its nominees. In delivering the stock, it was acting pursuant to the instructions of and as agent for Atel. The delivered stock was stock *of* the plaintiff, but not *its* stock. The facts here are wholly without the provisions of section 113.

 Plaintiff suggests that Lee Shubert's offer to distribute stock which otherwise would be part of his personal holdings was not wholly gratuitous, but was made to avert possible claims of creditors under the "absolute priority" rule of Northern Pacific R. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. Assuming, without deciding the question, that the offer was prompted by such a motive, it still does not follow that an after-thought may rise to the dignity of a pre-conceived plan of reorganization or justify invoking section 113 of the Internal Revenue Code. An attempt to forestall claims and to provide insulation to the stockholders of the new corporation from suit by giving the Shubert creditors a minor interest in the new corporation is not tantamount either to a reorganization or the acquisition of property by the new corporation by issuance of stock or as paid in surplus or as a contribution to capital. The requisite continuity of interest must flow from rights recognized in a plan, otherwise the continuity is broken. Its existence must be determined by reference to facts as they occurred and not legal rights which might have been, but were not, asserted. Cf. Templeton's Jewelers, Inc., v. United States, note (11) supra.

Plaintiff acquired the Shubert assets by purchase and not in furtherance of a tax-free reorganization. The basis it ascribed thereto in its tax return as filed was correct and the claim for refund is denied.

The foregoing shall constitute Findings of Fact and Conclusions of Law in accordance with Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.